UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

        Plaintiff,

   v.                                File No. 1:16-CR-25

WILLIAM ALAN SCHOCK,

        Defendant.
_____/

Sentencing

Before

THE HONORABLE ROBERT HOLMES BELL
United States District Judge
October 12, 2016

APPEARANCES

TESSA K. HESSMILLER           JOSHUA A. BLANCHARD
Assistant U.S. Attorney     309 S. Lafayette St.
P.O. Box 208                Suite 208
Grand Rapids, MI 49501      P.O. Box 938
Attorney for Plaintiff      Greenville, MI 48838
                             Attorney for Defendant

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter

```
 1                                    Grand Rapids, Michigan

 2                                    October 12, 2016

 3                                    8:50 a.m.

 4                          -      -      -

 5

 6                    P R O C E E D I N G S

 7

 8          THE COURT:  You may be seated.  Good morning, ladies

 9   and gentlemen.

10          MS. HESSMILLER:  Good morning, Your Honor.

11          THE COURT:  This is the matter of United States

12   versus -- let's see.  I've got the wrong file.  How is that?

13   I grabbed the wrong file -- versus Schock.  A plea was

14   previously tendered to this Court, and upon tendering this

15   plea a presentence report was prepared in this matter and it's

16   my understanding that presentence report was circulated to

17   both counsel and both counsel have had a chance to review the

18   same.

19          From the government's perspective are there any

20   additions, corrections or deletions to this presentence

21   report?

22          MS. HESSMILLER:  Your Honor, there's a correction

23   that both parties addressed in our sentencing memorandum which

24   is a correction to Paragraph 27.  That was a correction that

25   the parties had discussed during the finalization of the
```

1    presence report and just didn't make it into the final

2    version somehow.

3         But that paragraph states that the investigators

4    executed a search warrant at the defendant's Tucson, Arizona

5    residence on March 7, 2016.  During the search they seized

6    several electronic devices and discovered several photographs

7    of Victims No. 1 and No. 2 naked in the shower at the Arizona

8    residence.  The parties discussed that and it should be

9    corrected as mentioned in both of our sentencing memorandums.

10        The investigators executed a search warrant at the

11   Tucson residence on March 7, 2016 is correct, but they did not

12   find new and additional naked photographs of Victims 1 and 2.

13   Rather, they were able to corroborate existing photographs of

14   Victim No. 2 showering in a tile shower and also posing by

15   pulling her nightgown or nightdress over her face, exposing

16   her underwear in a bedroom.  They were able to confirm that

17   those photographs are all taken at the Tucson residence.  But

18   those were photographs that they previously seized from the

19   Manistee residence.

20        THE COURT:  Agreed?

21        MR. BLANCHARD:  I think that's factually accurate.

22   I have my objection regarding relevant conduct, and so her

23   correction with regard to information regarding Victim No. 1

24   is subject to my objection on relevant conduct.  But factually

25   I think that's not in dispute.

 1          THE COURT:  Relevant conduct?  Tell me that.

 2          MR. BLANCHARD:  In my sentencing memo I addressed

 3   and it was addressed in the addendum to the presentence report

 4   the inclusion for scoring purposes of the references to Minor

 5   Victim No. 1 as being relevant conduct.  So a number of the

 6   paragraphs in the presentence report, the ones that were in

 7   both plus the amended 27 and the added victim impact statement

 8   referenced Minor Victim No. 1.

 9          For scoring purposes I think it's important to

10   consider whether the stuff not related to the count of

11   conviction is relevant conduct.  I don't think here that it is

12   because 1B1.3(a)(1) defines relevant conduct for purposes of

13   this case, and that's all acts and omissions committed, aided,

14   abetted, counseled, commanded, induced, procured, or willfully

15   caused by the defendant that occurred during the commission of

16   the offense of conviction, in preparation for that offense, or

17   in the course of trying to avoid detection for that offense.

18          The (a)(2) definition includes scheme, course of

19   conduct that would generally capture this.  However, the

20   (a)(2) definition specifically excludes offenses for which --

21   excuse me, only applies to offenses for which multiple count

22   grouping can apply, and 2G2.1 is specifically excluded for

23   multiple count grouping, and so it eliminates the definition

24   of 1B1.3(a)(2).  I laid it out in my sentencing memo.  I tried

25   to lay it out, but my point is I don't believe that things

1    outside of the offense of conviction under this offense are

2    relevant conduct under 1B1.3.

3            THE COURT:  What's your position?

4            MS. HESSMILLER:  Your Honor, the photographs

5    regarding Victim No. 1 are certainly relevant conduct.  The

6    count of conviction does involve Victim No. 2, but the

7    photographs involving Victim No. 1 would be admissible at

8    trial and certainly are relevant to show the defendant's

9    intent in attempting to produce child pornography of Victim

10   No. 2.  They also occurred during the course of conduct of him

11   producing videos of Victim No. 2.  He produced Victim No. 1's

12   photographs in the middle of producing Victim No. 2's

13   photographs.

14           In addition, the information regarding Victim No.

15   1's photographs are directly relevant to this Court's

16   consideration for the pattern of abuse enhancement which is

17   not disputed, which a five-level enhancement under 4B1.5.  So

18   the photographs of Victim No. 1 also are relevant because they

19   explain to the Court how this investigation came to be.  They

20   explain how Victim No. 1 was the one who disclosed to

21   investigators.  That information led to a search warrant.

22   That information led to an interview with Mr. Schock which led

23   to discovery of evidence which led to discovery of evidence of

24   Victim No. 1 and 2.

25           It's certainly relevant conduct.  It's totally

1    ingrained in the offense, and it describes Mr. Schock's -- the

2    way that he executed this offense and also his intent in

3    producing the photographs of Victim No. 2 in the count of

4    conviction.

5           THE COURT:  I agree.  It's relevant, all relevant.

6           This is a different standard and it's interpreted

7    differently, apparently, according to my state judge friends

8    than the state judge courts do, but this is the way we do it

9    in the federal court.  This is the way it's been approved

10   numbers of times.

11          Anything else as to the presentence report?

12          MS. HESSMILLER:  Your Honor, one other thing

13   factually from the government's perspective.  There is a

14   dispute to Paragraph No. 26 in which the ex-sister-in-law of

15   Mr. Schock revealed to investigators that Mr. Schock's wife

16   told her that Mr. Schock and his wife had gone to Arizona and

17   that Mr. Schock had destroyed evidence, that he had thrown

18   away bags of items that he had removed from the house after he

19   told his wife to vacate the house for a few hours to let him

20   basically clean shop, and that they dumped those plastic bags

21   or that they went together to a park where Mr. Schock dumped

22   those plastic bags.

23          Mr. Schock denies that that happened.  Mrs. Schock

24   apparently through Mr. Schock's attorney also denies that that

25   happened.  The government does have that witness here today if

 1    the Court would find it useful to hear from her to resolve

 2    that dispute.  It's not a central element of the presentence

 3    report.  However, it does shed light on the nature and

 4    circumstances of the offense and the seriousness of evidence

 5    that was not even discovered.

 6              THE COURT:  You have an eyewitness as opposed to

 7    hearsay?

 8              MS. HESSMILLER:  I have the witness, Your Honor,

 9    that reported that these statements were made to her by Mrs.

10    Schock about the destruction of the evidence.

11              THE COURT:  That's hearsay, though.

12              MS. HESSMILLER:  It is hearsay, Your Honor, which

13    would be admissible in this hearing, but not at a trial.

14    You're right, Your Honor.

15              THE COURT:  Response?

16              MR. BLANCHARD:  I don't think -- the probation

17    officer found that that wasn't supported by a preponderance,

18    didn't score obstruction points.  So I don't know that the

19    Court has to resolve that issue here today with an evidentiary

20    hearing.

21              THE COURT:  No, that's not the standard we use

22    here.  I could, but I think it's clear hearsay.  It's clear

23    hearsay and it is not really material to the case as far as I

24    can see.  Sometimes we let appellate parachutes get developed

25    in these kind of matters, but I don't think this is -- I don't

1   think it's pertinent to what I have to do.

2              Anything else?

3              MS. HESSMILLER:  Not from the government, Your

4   Honor.

5              THE COURT:  Anything else?

6              MR. BLANCHARD:  I have the scoring objection for

7   multiple counts that I noted in my pleadings.

8              THE COURT:  You may be heard.

9              MR. BLANCHARD:  Thank you, Your Honor.

10             THE COURT:  Tell me why it's relevant to this case.

11             MR. BLANCHARD:  Because it adds a two-point -- it

12  adjusts the sentencing guideline calculation by two points.

13  In 2G2.1(d)(1) there's a cross-reference to 3D1.1 if the

14  offense involved exploitation of more than one minor.  And so

15  if the Court looks at 1B1.1 Application Note 1(h), offense

16  means the offense of conviction and relevant conduct under

17  1B1.3.  I recognize the Court's earlier ruling on relevant

18  conduct, but my two arguments are very intertwined, so I think

19  I need to make it for purposes of preserving the record here.

20             I don't believe that because the offense of

21  conviction had depicted one minor only, and my interpretation

22  of 1B1.3(a)(1) versus (a)(2), the government's arguing course

23  of conduct brings Victim 1 into this.  I believe that (a)(2)

24  deals with course of conduct and it specifically excludes this

25  offense from the definition of relevant conduct.  And for that

1   reason, I think the offense is determined by the offense of

2   conviction and relevant conduct which is limited for this

3   charge, I believe, to just the offense of conviction.

4           As a result, I think it's improper to follow the

5   cross-reference to 3D1.1 and engage in the multiple-count

6   scoring using the pseudo-counts where they say because there

7   was a course of conduct involving two minors, we treat them as

8   though they were in separate counts of conviction and then we

9   do the multiple count scoring.  So I think it's inappropriate

10  because I believe the definition of offense and offense of

11  conviction and relevant conduct limited in this situation to

12  Count 3 for which he's been convicted, I think the Court

13  should not score the additional two points under the multiple

14  count enhancement in 3D1.1.

15          THE COURT:  Response to 3D1.1?

16          MS. HESSMILLER:  Your Honor, it's definitely an

17  interesting argument and a complicated one, but case law does

18  support the application of the pseudo-counts where the

19  defendant sexually exploits more than one minor whether each

20  minor is included in the count of conviction or not, but only

21  if the sexual exploitation was close in time and similar in

22  nature to the offense in the count of conviction, which in

23  this case it was.

24          For example, in United States v. Martin, which is a

25  Sixth Circuit case from 2008, the defendant was charged with

1    three counts of producing child pornography, one of Victim 1,

2    one of Victim 2, one of Victim 3.  He pled to producing child

3    pornography of Victim No. 3, and the Sixth Circuit held that

4    the District Court properly applied pseudo-counts for Victims

5    No. 1 and 2 even though he only pled to the count involving

6    Victim No. 3.

7              Similarly, there's a Seventh Circuit case, United

8    States v. Craig, where the --

9              THE COURT:  I don't think we need to go to the

10   Seventh Circuit.

11             MS. HESSMILLER:  Okay.  But there are cases, Your

12   Honor, where the various courts discuss applying the

13   pseudo-counts where the abuse of a second child is close in

14   time and similar in nature and it does count.  The government

15   would request that if the Court were to vary downward from the

16   sentence, the guideline sentence, that this issue would become

17   moot if the Court were to state on the record that the

18   application of the pseudo-count had no impact on the Court's

19   decision because, of course, if the pseudo-count were not

20   there, it would reduce --

21             THE COURT:  Where did this concept of pseudo come

22   from?  Is it a new appellate court -- I mean, I think I've

23   been around a little while, 30 years, but where did the pseudo

24   come from?

25             MS. HESSMILLER:  The pseudo-count, Your Honor, is

1    just a reference to when the guidelines call for treating --

2    for basically treating each victim as a different count of

3    conviction as it does in the guidelines for producing child

4    pornography.

5         THE COURT:  Where did that term come from?  I've

6    never heard it before.

7         MS. HESSMILLER:  I'm not sure.  It's pseudo, you

8    know, like a pseudonym.

9         THE COURT:  Here's the writer.  We'll ask him.

10   Where did that word come from?

11        PROBATION OFFICER WILLIAMS:  Your Honor, I think

12   that's probably something better answered by the attorneys.  I

13   think, like the government said, it's when you have cases that

14   have multiple victims and it's considered a crime of violence,

15   so you can group --

16        THE COURT:  But I've had hundreds of these.  They

17   never use that term.  Why is that term -- where did it come

18   from?

19        PROBATION OFFICER WILLIAMS:  I could look into that

20   for you, Your Honor.

21        THE COURT:  I'd like you to.  I'm just interested.

22   Crazy.  But I understand your point.

23        MS. HESSMILLER:  Okay.

24        THE COURT:  I understand your point.  I don't care

25   whether you call it a pseudo-count or what you call it.  It's

1    relevant to this case.

2              The Court looks at all the facts and factors before

3    sentencing.  We don't just build huge hedges around the facts,

4    and I sense that's what some of this is going on.  And so I'm

5    going to overrule the objection.  Two victims.  They will

6    be -- obviously it will be one sentence, but there's two

7    victims, and so the Court has the ability to look at the two

8    victims separately, but together the sentence is computed.

9    It's clear.  Common sense.  It's always been.

10              Okay.  Anything else?  Any other objections?

11              MR. BLANCHARD:  I don't have any other objections or

12    corrections, Your Honor, thank you.

13              THE COURT:  Okay.  Anything else?

14              MS. HESSMILLER:  No, Your Honor.

15              THE COURT:  Okay.  All right.  Mr. Schock, have you

16    had a chance to review this presentence report with your

17    attorney?

18              DEFENDANT SCHOCK:  Yes, I have, Your Honor.

19              THE COURT:  Are you satisfied with his

20    representation of you in this matter?

21              DEFENDANT SCHOCK:  Yes, I am, Your Honor.

22              THE COURT:  Very well.  Anything we should take up

23    in this matter before allocution?

24              MS. HESSMILLER:  There is a restitution request,

25    Your Honor, which I can address during my allocution.

1     THE COURT:  Anything else?

2     MR. BLANCHARD:  Your Honor, I have my motion for

3 variance.  I think I can incorporate that into my allocution

4 and sentencing argument.

5     THE COURT:  Very well.  You may come to the podium

6 with your client.  You may proceed.

7     MR. BLANCHARD:  Thank you, Your Honor.

8     This case started out in state court.  After a

9 period of time Mr. Schock was indicted, state charges were

10 dismissed, and we ended up in federal court.

11     I've had an opportunity to work with Mr. Schock over

12 the past 13 months while this case has been pending both in

13 state court and here.  I think it's important when considering

14 the sentencing factors and 3553(a) the Court consider, one,

15 Mr. Schock has taken responsibility for his actions and has

16 pled guilty here.  He's done that for a number of reasons.

17 Included within that were to accept responsibility, but also

18 to spare the parties and his granddaughters the necessity of a

19 trial.  A trial in this case would have been unpleasant for

20 everyone.  It would have caused greater harm.  I think he's

21 recognized in his statements to the Court and I expect he will

22 today that he's caused harm and he didn't want to exacerbate

23 that to any degree.

24     I think it's important to note that Mr. Schock has

25 absolutely no criminal history.  This is his first contact

1    wtih the criminal justice system.  He's 66 years old.  And so

2    I think some credit ought to be given to Mr. Schock for the

3    fact that he has I think by all accounts led a productive,

4    law-abiding life.

5         Mr. Williams noted in his presentence report that by

6    all accounts Mr. Schock has lived five decades without

7    committing any criminal activity, at least that anyone's aware

8    of, and I think that's consistent with the things that were

9    laid out in our sentencing memorandum, that he's led a good

10   life up until this event.

11        He was gainfully employed really from the time of

12   high school through his retirement in 2011.  As I noted in my

13   sentencing memorandum, he went to Purdue University on a co-op

14   scholarship where he worked for Kellogg Company and alternated

15   attending Purdue.  He obtained a degree in chemical

16   engineering from Purdue.  Upon graduation he went to work for

17   Dow Corning and stayed with Dow Corning for his entire

18   career.  He stayed with Dow Corning or its subsidiary, Hemlock

19   Semiconductor, through 2004.

20        When he left in 2004, he taught at Delta College.

21   He trained displaced auto workers on how to become chemical

22   operators in the chemical processing field to help them regain

23   employment, and he did that till 2011 when he completely

24   retired.

25        I think it's -- and I don't mean to excuse the

1   conduct at all, but the correlation between the criminal

2   conduct that gave rise to this case and his retirement is

3   significant.   This conduct started around the time he stopped

4   having productive, useful efforts in the workplace.   They

5   ended the program at Delta and he had all this time on his

6   hands, and I think Mr. Schock spent a significant portion of

7   his life with people that depended on him, with things that

8   needed attention, problems to solve, and he suddenly had a

9   void in his life that I think initially was filled with

10  appropriate, loving, normal contact with his granddaughters,

11  and I think that changed over time.

12        I think that void was filled and the attention was

13  something -- he had this void in his life, and I think it

14  morphed into something very inappropriate.   But I think that

15  was sort of the trigger.   I think that's significant with

16  respect to the report from Dr. Sugrue that talks about Mr.

17  Schock's low risk to reoffend, that he's in the lowest

18  category and that future danger can be mitigated by relapse

19  prevention strategies that address some of those issues.

20  Supervision through the Court can mitigate any future risk to

21  the public.

22        I think it's also important to note that he has very

23  strong pro-social supports.   He has the support of his wife.

24  His wife is present in the courtroom today.   Mr. and Mrs.

25  Schock have been married for 25 years.   This has been very

1    difficult for them, but she is committed to helping Mr. Schock

2    to rehabilitate and recover.

3            She's present in the courtroom.  His son is present

4    in the courtroom along with a number of friends who submitted

5    letters that were attached to our sentencing memorandum.  And

6    so he has -- as the Court's aware, strong pro-social supports

7    are important to rehabilitation and the ability to conform

8    conduct in the future.  All of these people are aware, all the

9    people present in the courtroom are aware of the problem Mr.

10   Schock has, what's occurred, and they're willing to support

11   him going forward, and so I think that's a significant factor

12   in what an appropriate sentence should be.

13           I believe I noted Dr. Sugrue's report, a low risk to

14   reoffend.  He also noted in his report that Mr. Schock has

15   made significant progress over the course of this case.  Dr.

16   Sugrue met with Mr. Schock early I believe when the state case

17   was pending and then in July of this year, and over that

18   roughly six-month period he's noticed a significant change in

19   terms of how Mr. Schock identifies the harm caused, who's the

20   primary victims of that.  He also noted that Mr. Schock

21   doesn't have any antisocial personality characteristics that

22   would cause somebody doing a risk assessment to be concerned

23   about his risk to commit another crime or to engage in

24   recidivistic behavior.

25           He also noted that the kind of offense here, the

1    incest type offense versus the extra-familial type offense,

2    has a lower risk to reoffend.  The kind of person who engages

3    in intra-familial crime versus extra-familial has different

4    risk characteristics, and so I think that's important for the

5    Court to consider.

6            I also noted in our sentencing memorandum the

7    significant community service history my client has.  He

8    through the course of his life has done things to give back to

9    his community in an appropriate way.  He was on the board of

10   the Saginaw United Way.  He engaged in a steering committee

11   for educational opportunities related to the chemical

12   industry.  And so he's done things that give back to his

13   community that I think are in stark contrast to the offense

14   he's committed here and I think gives some insight to Mr.

15   Schock has done a lot of good and can do good in the future

16   given the opportunity.

17           I don't think anybody's trying to mitigate or to say

18   this isn't a serious offense.  It is a very serious offense.

19   Trying to place the offense on the spectrum of the kind of

20   behavior that can be captured by the statute is I think

21   difficult, but I think it's worth noting that the images

22   captured, there's no evidence that they were ever distributed

23   in any way.  And so in terms of the amount of harm that's

24   caused, I think everyone would agree if the images are

25   distributed, there is some more harm, and there was no

1    distribution here.  There was no sales.  There was no

2    commercial purpose.

3         The pictures don't depict the children engaging in

4    intercourse or, you know, what's classically understood to be

5    a sex act.  I understand that the photos themselves are

6    sexually prohibited conduct, but they're not depicting

7    intercourse or things along those lines.  So I think that when

8    we're placing it on the spectrum of the conduct that can be

9    captured, it's somewhat less significant than other things

10   that could have occurred here.

11        I think it's also important to understand that Mr.

12   Schock was cooperative.  This came about as a disclosure by

13   the police -- or excuse me, a disclosure by the child that

14   made it to the police.  They executed a search warrant.  Mr.

15   Schock, frankly he told the troopers when they executed the

16   search warrant about those disks, and I believe the Court took

17   testimony to that effect at a previous hearing from the

18   trooper.  He pointed out what they were looking for and he sat

19   down and he to his own detriment confessed to them.  I know

20   the government takes issue whether he confessed to everything

21   or not, but he confessed to enough to get him convicted of

22   this offense.  I think he talked about one of the two minor

23   victims to the police, not both of them.  But he confessed to

24   the police and he was cooperative.  And so I think when we're

25   looking at the seriousness of this offense on the spectrum, I

1    think Mr. Schock's conduct is not toward the most severe end

2    of that spectrum.

3            When the Court's considering imposing a sentence

4    that would provide adequate deterrence to the public, I think,

5    and I cited to some analysis of this in my sentencing memo,

6    but I think the fact of getting caught, being brought into

7    federal court and prosecuted, that by itself without regard to

8    the sentence has a significant deterrent effect, just the fact

9    of being apprehended and brought in.

10           Then we add on top of that the sex offender

11   registration and notification requirements.  Mr. Schock will

12   for the rest of his life be subject to SORA, and SORA has

13   significant consequences to a person.  It limits where you can

14   live, where you can go, some of the things you can do.  And in

15   Mr. Schock's proposed state of residence, Arizona, it's a

16   notification state.  And so in Arizona, when Mr. Schock's

17   released, if he's released and he goes to reside with his

18   wife, the police or police volunteers will go out to all of

19   his neighbors and tell them you've had a sex offender move

20   into your neighborhood.  And so that has a significant

21   deterrent effect that I think mitigates the need to impose a

22   significant custodial sentence for the purpose of deterring

23   future criminal conduct.

24           Similarly, when the Court's considering the need to

25   protect the public, I think importantly, and I've touched on

1    this, Dr. Sugrue's report touching on future risk to reoffend

2    is significant.  He determines, and he laid out his

3    credentials, I think he's quite qualified, that Mr. Schock

4    poses a low risk to reoffend, and so I think that's an issue.

5            No other criminality is present here, and so I think

6    that's important to understand that we've got one event and

7    there is going to be a very severe consequence for it.  I

8    think that would drive Mr. Schock to conform his behavior if

9    he's given the opportunity to again live in society, and so I

10   don't think we have the same concerns about protecting the

11   public.

12           Mr. Schock is 66 years old.  I cited to the Social

13   Security Administration life tables.  At 66 years old Mr.

14   Schock is expected to live 17.03 more years.  And so if Mr.

15   Schock is allowed the opportunity to be released from prison,

16   he will be at a fairly advanced age.  I would imagine his

17   earliest possible release would be somewhere around age 80,

18   and I think the risk of future crimes to the public are to

19   some extent mitigated by age.  I also think it makes

20   management easier, and any risk to the public can be mitigated

21   through supervised release of, you know, at a minimum an

22   80-year-old.  And so I think protecting the public from future

23   crimes can be handled through supervised release.

24           With regard to the sentencing enhancements that come

25   under the guidelines, there's an enhancement that's added

1   because the victim was under the age of 12 years old, and I

2   find that the sentencing guidelines are somewhat a one-way

3   ratchet up in order to mathematically hand out a harsher

4   sentence.  And 12 years is an arbitrary age.  If we're a

5   little under, a little over, I don't know that it really makes

6   the offense worse.  The offense is bad, and adding what in

7   this case is a significant, depending on low end or high end

8   of the guidelines, you know, five to ten years to the sentence

9   based on an age determination, I'm not sure that there's any

10  evidence to support that the offender who engages in an

11  offense with someone under the age of 12 versus over the age

12  of 12 is more of a danger to society or needs more time in

13  prison to rehabilitate or needs more deterrence.  And so I

14  don't know that that calculation is appropriate, so I think

15  it's appropriate to vary on that basis.

16          Similarly, there's a five-point enhancement for

17  engaging in a pattern of conduct, and that pattern as I

18  understand the government's position refers to taking pictures

19  over time rather than, you know, a pattern of children, but

20  taking pictures over time.  And what we have here I don't

21  think is really out of the norm for an offense like this that

22  you took pictures over a, I think, relatively short period of

23  time and of two children, although the bulk of them are of one

24  child.

25          THE COURT:  I have October 29, 2011 to April 17th,

```
 1    2015.  That's three and a half years.
 2              MR. BLANCHARD:  Right, and I've encountered cases
 3    where this goes on for a decade or two decades.  And so I'm
 4    just trying to put it on a scope of pattern is all I'm doing.
 5    I'm not saying that it was days or minutes or hours.  I'm just
 6    saying the progression I don't think is abnormal in a case
 7    like this to have a couple years where this goes on and then
 8    it's discovered.  I think normally it's discovered when
 9    there's trading or something or distribution or sales.  But I
10    don't think the pattern is out of the ordinary, and so I
11    question whether it's appropriate to add a five-level
12    enhancement that significantly alters the sentencing
13    guidelines and advises the Court of a different range.
14              I may have mentioned the probation officer noted as
15    one of the reasons for the variance his 50 years of
16    law-abiding conduct; also that Mr. Schock has raised two
17    biological children, one of whom is present in the courtroom
18    today, and there's no allegation that he engaged in any
19    inappropriate conduct with either of them.  And so he by all
20    accounts did a good job raising his children.  I think there's
21    some credit to be given for that.
22              With regard to the fine, I think that in the
23    financial statements there was -- there's financial
24    information.  Essentially the non -- the cash that belongs to
25    my client as opposed to his wife's IRA or joint assets, he has
```

1    about $50,000 in an IRA.  There's a restitution request coming

2    to the Court for $25,000.  I would expect that after Mr.

3    Schock liquidates that IRA and has the taxes withheld, he's

4    going to have somewhere in the neighborhood of $35,000 in

5    cash available.

6            And so I would ask that the Court consider that in

7    fixing an appropriate fine.  Anything above Mr. Schock's

8    resources I think accrue to punish Mrs. Schock for Mr.

9    Schock's behavior because she's dependent on Mr. Schock to

10   live the life that she planned to live.  And so I think that's

11   a sufficient reason to vary downward from the guideline range

12   for a fine.

13           For the reasons that I've indicated before, I think

14   it's appropriate to vary downward from the guideline range for

15   a custodial sentence in this case, and I would ask that the

16   Court do so in an appropriate amount to reflect a sentence

17   that is sufficient, but not greater than necessary to

18   accomplish the purposes of sentencing.

19           I'd ask that the Court consider while this case has

20   been pending, except for I think two days in between first

21   appearance and a detention hearing, Mr. Schock has been

22   released on tether.  He has complied with all of my requests,

23   all the requests of Pretrial Services, and all of the orders

24   of the Court.  He's been nothing but a gentleman.  He showed

25   up today understanding that he faced a very serious, lengthy

1    custodial incarceration.  I'd ask that the Court permit him to

2    surrender at the direction of either the marshals or the

3    Bureau of Prisons.

4            I'd also ask the Court consider recommending to the

5    Bureau of Prisons that he be designated to Cedar Hill, Texas

6    to the Federal Correctional Institution there.  The reason for

7    that request is twofold.  Cedar Hill, Texas has a sex offender

8    management program.  It's also a one-day drive, roughly, from

9    Ms. Schock's proposed residence in Tucson, Arizona, and so it

10   would allow him to maintain some important contacts outside of

11   prison.

12           So for those reasons I'd ask the Court to grant my

13   request for downward variance and impose an appropriate

14   sentence.

15           THE COURT:  Thank you.  Thank you, Mr. Blanchard.

16           Mr. Schock, is there anything you would wish to say

17   at this time?

18           DEFENDANT SCHOCK:  Your Honor, the first thing I'd

19   like to say is I take full responsibility and accountability

20   for my actions and the photographs that I took of my two

21   granddaughters.  I would like to apologize to my

22   granddaughters, my daughters for the harm and potential future

23   harm and distress and embarrassment that's caused them.  I

24   thank my family and my friends for standing behind me, my wife

25   especially, and basically I'm accountable and I will do

1    whatever the Court rules that I have to do, whatever the

2    judgment is.

3                THE COURT:  Thank you.  Thank you.

4                Does counsel for the government wish to say

5    anything?

6                MS. HESSMILLER:  Your Honor, the offense level here

7    is 42 and the guideline range is 360 months.

8                As the Court already noted, this offense did take

9    place -- or the victimization of these two children, rather,

10   took place over a three-and-a-half-year period and the girls

11   were six, seven, and eight years old.  They were easily

12   manipulable.  They're extremely young.  Mr. Schock made it

13   into a game.

14               THE COURT:  I know all that.  Just tell me what else

15   I need to know.

16               MS. HESSMILLER:  Okay.  I'm just responding to

17   defense arguments, Your Honor, about recidivism.  The report

18   that the defense submitted, the psychological evaluation

19   describes Mr. Schock's affliction as essentially

20   late-developing pedophilia.  The diagnosis is pedophilic

21   disorder with narcissistic and compulsive personality

22   features.  The diagnosis reports sexual urges and fantasies

23   about children ages 13 and younger.  The type of pedophilia

24   that the report describes describes specifically

25   grandfather-type pedophilia, and there's two different types,

1  and the type that he has is the type that develops late in

2  age, which does not indicate that it would get better over

3  time.

4        For restitution, Your Honor, the government is

5  submitting a restitution request from Victim No. 1 who also

6  submitted a victim impact statement that the victim has

7  requested be read to the Court with the Court's permission.

8  It's the victim impact statement in Paragraph No. 28 of the

9  presentence report.

10        The victim's mother says:  "I would like to say the

11  crime against my daughter has hurt me and my family in so many

12  ways.  I don't know where to begin on my daughter's behalf.

13  It terrifies me to think of kids teasing her if they were ever

14  to find out what happened and the lasting effects that it may

15  have on her.  It terrifies me to think about the disgusting

16  pictures that may or may not be floating around out there ever

17  surfacing.  It terrifies me to think of my eight-year-old

18  daughter's innocence being taken away by an awful human being

19  she once called Grandpa.  It terrifies me to think my

20  daughter's quality of life physically or mentally may have

21  been compromised by this man.  It terrifies me to think that

22  my daughter could develop trust issues or social issues very

23  common with this type of crime in the future.

24        "As for her father and I, it hasn't been easy.

25  Imagine if this happened to you.  Imagine your own mother told

1   you that she was going to stand by and support the very man

2   that did these horrible things to these two little girls, one

3   being my daughter.   Not only has this torn our family apart

4   and divided us, it has been embarrassing to the most extreme

5   levels.   Every time a news article comes out on this case I

6   have friends, family, and co-workers asking questions and

7   offering their opinions.   I feel like I can't escape this.

8   Every time I have to talk to a detective, a counselor, a

9   prosecutor, friends and family, it's like I have to relive

10  this tragedy over and over again.   There are days I feel my

11  only real will to live are my children.   I can't tell you how

12  many nights I've cried myself to sleep over this chain of

13  events and what's in store for her future.   I'm filled with

14  anger, anxiety, and distrust.   Imagine your eight-year-old

15  girl asking to go play at a friend's house down the road and

16  you tell her no, but you can't explain to her why.   It's not

17  her fault I no longer trust people, but how do I tell her

18  that?

19          "I would like to end this letter by saying there's

20  one person responsible for all this pain, suffering, and

21  embarrassment.   I don't need to say his name, but would like

22  to say you have torn our family apart and turned our world

23  upside down.   I would never wish this on my worst enemy."

24          So she -- that person was Victim No. 1's mother who

25  wrote that statement, and she is requesting restitution in the

1    amount of $25,338 which includes a request for $378 in total

2    lost wages for missing four days of work to come to various

3    court hearings associated with this case and $24,960 in

4    counseling costs for weekly 16- to 37-minute sessions for the

5    next five years at a cost of $96 a session.  Those two

6    requests are substantiated by the attachments to the

7    government's revised restitution memo and response to

8    defendant's sentencing memorandum.  The defendant did agree to

9    pay restitution both to Victim No. 1 and 2 as part of his plea

10   agreement, and therefore, Victim No. 1 is entitled to seek

11   restitution for the two types of harms that her family is

12   seeking:  the lost wages for coming to court and the cost of

13   counseling.

14          Finally, Your Honor, the government -- in response

15   to the request for self-surrender, the government argued for

16   detention, requested remand under the mandatory remand

17   provisions at the guilty plea, and again requests remand under

18   the mandatory remand provisions of the Bail Reform Act and

19   requests that Mr. Schock be taken into custody today.  Thank

20   you, Your Honor.

21          THE COURT:  Thank you.

22          It becomes this Court's obligation to impose a

23   sentence in this matter, having listened carefully to both

24   counsel, having reviewed a presentence report that was

25   prepared specifically in this matter by Mr. Williams with some

care, and the Court has reviewed that, as I say, extensively.
The Court as well took the plea in this case and has reviewed
the plea-taking process that Mr. Schock gave to this Court in
open court some time ago, a couple months ago.

        The Court notes that this matter carries an adjusted
offense level of 42 and a criminal history level of I under
the so-called guidelines in this matter.  The guidelines are
really not guidelines as such.  They're more -- they have a
mandatory sense about them that has calcified over time.  But
this Court finds that in reviewing appellate decisions that
have addressed matters such as this where the offense level is
40 or exceeding that under the guidelines, that there is much
more fluidity in reviewing what is an appropriate sentence for
a particular individual, and this Court believes this is
probably the most apt case that has come along in a long time
where the Court can look at this case by itself kind of like
we did in the old days where we could look at it and we could
say that we think an appropriate sentence is this, not -- and
I'm going to reference the guidelines, 42-I, but I'm also
going to say that I think that this does not fall neatly and
cleanly within a guideline because of the age, because of the
nature and circumstances in this matter.

        This is what we call a non-touching offense, and
under pedophilia circumstances a non-touching offense is
significantly different than a touching offense.  It's

1    obvious.   It's obvious.

2            Now, this occurred over a period of about three and

3    a half years from about October 2011 till about April of 2015,

4    and so occurring over a long period of time has both -- there

5    are some things to be said about that.  But in this case what

6    is of great significance to the Court is the fact that these

7    were grandchildren and this was within a family structure and

8    a structure where there was authority, and obviously the

9    grandfather in a structure where the grandchildren are with

10    him is the authority figure every bit as much as the mother is

11    or the grandmother is over children.

12            So a person in authority undertaking these kind of

13    sexual gratification activities for himself -- not them, but

14    for himself -- is to be evaluated differently than the person

15    who, as is so typical, gets into pornography on the Internet

16    and makes copies of it and stores it and sends it around.

17    Ninety-nine point nine five percent of what this Court sees in

18    this arena are generally Internet types.  This is not.

19            This is more serious because not only does it take

20    the authority figure to the very vulnerable child status, but

21    in fact it exploits it over a period of time.  It's

22    non-touching from what I can see.  Everything says that they

23    weren't touched.  But the same effect is had upon them.  They

24    were directed to do things.  They were told to do this, and

25    obviously when they did these things, the grandfather gave

1    them a sign of appreciation for the fact that they were doing

2    what he directed them to do, and that's very, very troubling.

3    Very troubling to this Court, and it should be to everyone.

4            It occurring over a long period of time, the reason

5    for the timeliness being more serious than being incidental is

6    because Mr. Schock time and time again made a decision.

7    Either I have the girls here and this is what I'm going to do

8    or I'm not going to do that anymore.  And he made the decision

9    several times to go ahead, have these pictures that he could

10   enjoy, and no one else.  That's very important, and no one

11   else.

12           So therefore, the nature and circumstances of this

13   offense become egregious in that context.  Clearly there was

14   nothing thought about in terms of legal parameters.  There

15   should have been moral parameters that should have been loud

16   and clear to him, and they were apparently in all other

17   respects in his life, but they were missing in this respect,

18   and that gives this Court pause to be very concerned.

19           So therefore, the nature and circumstances of this

20   offense and the history and characteristics of Mr. Schock this

21   Court finds dictate a sentence that is appropriate for the

22   Court in a number of contexts.  One is it has to send a strong

23   message to others who are similarly situated to Mr. Schock

24   that this is not behavior that society and law in any way

25   condones; that is, this is egregious conduct, that this is

1    very hurtful conduct, and that this kind of conduct has

2    long-term consequences.  And the only way to stop that is to

3    send that clear message.

4         Punishment, yes.  Deterrence to future criminal

5    conduct, yes to Mr. Schock, obviously, and yes to anyone else

6    who knows, has reason to believe that this is what they can

7    expect will occur to them if they engage in this behavior, and

8    I think that's absolutely essential.  To protect the public

9    from further crimes of Mr. Schock, I don't know as that's

10   really -- it's a criteria.  I'm not sure that's what I focus

11   upon in this matter.  But this Court believes that a just

12   punishment looking at the seriousness of this offense and the

13   circumstances and characteristics of vulnerability that this

14   authority figure had makes it such that a prison sentence must

15   be imposed.

16        Now, this Court believes by virtue of the fact that

17   Mr. Schock came in here and forthrightly confessed to what he

18   had done in response to this Court's inquiry at the guilty

19   plea and has continued to assert that in fact what he did was

20   wrong should be given some credit.  This Court believes that

21   at age 66, that should be viewed differently than a younger

22   person by virtue of the lifespan that's been accorded to us

23   and life expectancy of 17.3 years.  That has to be factored in

24   to this Court as this Court reviewed this.

25        This Court believes that a sentence that provides

1      some correctional treatment, some educational treatment, and

2      obviously monitors medical conditions with what -- I can't say

3      this is a low risk of reoffense, but I can say the likelihood

4      of reoffense is fairly low by virtue of the fact that the

5      victims of this offense are no longer around him and he will

6      not be around those kind of children in the future here for

7      awhile.  So therefore, this Court believes that a sentence

8      which looks at the nature and circumstances of this offense,

9      the seriousness of this offense, the lack of respect for law,

10     lack of respect for family union that that had means that a

11     deterrent to criminal conduct in the future must be set forth,

12     and therefore, that a sentence that takes all these things

13     into consideration, but comes below that open guideline of 360

14     months to life is appropriate for this particular case at this

15     particular time.

16              So therefore, the Court believes that 240 months in

17     the custody of the Federal Bureau of Prisons with several

18     conditions.  I'll spell those out very carefully.  That a full

19     psychological evaluation in conjunction with his -- the

20     receipt of him at the institution is essential.  It mandates

21     what occurs thereafter, programming and otherwise.  Secondly,

22     the Court is going to require that Mr. Schock pay a monthly

23     stipend to the Federal Bureau of Prisons equal to the cost of

24     his incarceration as determined by the Federal Bureau of

25     Prisons and that this be paid by someone in his family when

1    that amount is determined so that in fact the taxpayers of the

2    United States do not have to pay the costs of his care.

3           Next, the Court finds that the payment of $25,000

4    for counseling fee reimbursement should be required in this

5    matter.  This Court has never reimbursed people for time they

6    took off from work to do something.  It just is unmanageable.

7    So therefore, this Court doesn't believe that that is its

8    role.

9           Now, the Court further finds that a period of five

10   years of supervised release is to follow any incarceration,

11   and the first standard condition of it shall be registration

12   as a sex offender in the locality in which he resides, that he

13   provide financial information concerning credit cards and bank

14   statements to the supervised release officer, and he

15   participate in sex offender assessment and treatment if it is

16   required as a result of examination of him.

17          If he should be employed or be in a position where

18   in fact he is within contact with children under the age of 18

19   in any setting, whether it is residential or otherwise, he

20   shall in fact -- they shall in fact either be removed or he

21   shall be removed from that situation.

22          He shall consent to periodic announced and

23   unannounced examination of his computer or computer-related

24   devices as that is oftentimes an access point that this Court

25   believes is -- but he shall not himself have access to a

```
1    computer or any material that relates to child pornography in

2    any way.  He shall comply, respond and comply with the

3    requirements of the sex offender registration and notification

4    under federal law as directed by the supervised release

5    officer.

6              He shall in fact, as I said, make restitution of

7    $25,000 for counseling here.  A mandatory special assessment

8    of $100 would be required as part of this Court's imposition

9    of sentence in this matter.

10             Does government have a motion as it pertains to

11   Counts 1, 2, 4 and 5?

12             MS. HESSMILLER:  Yes, Your Honor.  The government

13   moves to dismiss those counts.

14             THE COURT:  Motion granted.  Any legal objection to

15   the sentence imposed not previously raised from the

16   government?

17             MS. HESSMILLER:  No, Your Honor.

18             THE COURT:  From the defense?

19             MR. BLANCHARD:  Just to the monthly cost of

20   incarceration, Your Honor.  I don't think given my client's

21   financial circumstances it's appropriate to impose it.  It

22   would be an excessive fine.

23             THE COURT:  He would in fact be receiving the

24   monies, won't he?

25             MR. BLANCHARD:  Well, he has a pension, but my
```

1    client's wife I think has a property interest in his pension,

2    having been married for 25 years.

3                THE COURT:  That wasn't my question.

4                MR. BLANCHARD:  I'm sorry.

5                THE COURT:  My question was he does have an income

6    stream coming in.

7                MR. BLANCHARD:  He has a pension, yes, Your Honor.

8                THE COURT:  Very well.  Anything else?

9                MR. BLANCHARD:  Not other than I previously stated,

10   Your Honor.

11               THE COURT:  You have a limited right of appeal of

12   this sentence and this conviction.  You have 14 days within

13   which to file an appeal in this matter.  Your obligation upon

14   counsel will be to continue representing you until relieved by

15   any appellate court.  You'll be remanded to the custody of the

16   marshal for execution of this sentence at this time.

17               That's all.  Thank you, Mr. Blanchard, for your

18   representation.  That's all.

19               MR. BLANCHARD:  Thank you, Your Honor.

20                   (Proceedings concluded at 9:43 a.m.)

21

22

23

24

25

CERTIFICATE OF REPORTER

I, Kevin W. Gaugier, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within-entitled and numbered cause on the date hereinbefore set forth.

I do further certify that the foregoing transcript was prepared by me.

/s/  Kevin W. Gaugier

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter
110 Michigan N.W.
622 Federal Building
Grand Rapids, MI 49503